UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | Criminal No. 13-CR-223 |
| v. : | |
| : | Violation: |
| : | 26 U.S.C. § 7201 (Tax Evasion) |
| ALAN MESSNER, : | |
| Defendant. : | |

**STATEMENT OF THE OFFENSE**

**FILED**

**AUG 2 9 2013**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

At all times relevant to the offense:

**Relevant Entities and Individuals**

1. Alan Messner ("MESSNER") was married to Andrea Messner, and the couple resided in Palatine, Illinois.

2. Jon C. Cooper ("COOPER") resided in Washington, D.C. Among other things, COOPER was employed at a law firm, H & Associates, with LAWYER H, and worked at that law firm's office located in Washington, D.C.

3. In or about September 2005, COOPER and MESSNER formed THIRDSTONE AIRCRAFT LEASING GROUP ("THIRDSTONE"). MESSNER held the title of President and Chief Executive Officer of THIRDSTONE. COOPER held the title of Vice President, Secretary, and Chief Operating Officer of THIRDSTONE. From the inception of THIRDSTONE until and including December 2006, THIRDSTONE did not own, possess, or control any significant funds, aircraft, or assets of any kind.

4. COMPANY A was an airline company headquartered in Indonesia.

5. BROKER S was an aircraft leasing broker located in California. BROKER S worked on the transaction between COMPANY A and THIRDSTONE described below.

6. BROKER M was an aircraft leasing broker located in Washington, D.C. BROKER M worked on the transaction between THIRDSTONE and COMPANY B described below.

7. COMPANY B owned several Boeing aircraft. As used herein, COMPANY B refers collectively to a legal entity and all entities controlled by it or otherwise acting on its behalf.

### MESSNER's Personal Finances in or about 2006

8. By in or about late 2006, MESSNER and his family had significant personal debt that MESSNER's actual income could not support, including, for example, mortgage debt of over $1 million.

### MESSNER's and COOPER's Material False Representations, Pretenses, and Promises to Induce COMPANY A's $1 Million Security Deposit

9. From in or about November 2006 through in or about February 2007, MESSNER and COOPER, using THIRDSTONE, acted to obtain a $1 million security deposit from COMPANY A related to a proposed aircraft leasing transaction. After receiving the $1 million security deposit, COOPER and MESSNER spent the proceeds for their personal use and benefit.

10. To induce COMPANY A to pay the $1 million security deposit, COOPER and MESSNER made statements containing material false and fraudulent pretenses, representations, and promises to COMPANY A, knowing that such pretenses, representation, and promises were false, and that such pretenses, representations, and promises would reasonably induce COMPANY A to pay the security deposit.

11. In or about November and December 2006, COOPER, MESSNER, BROKER S, and COMPANY A executives were negotiating an arrangement whereby THIRDSTONE would purchase two aircraft and lease them to COMPANY A.

12. At or about the same time, COOPER and MESSNER contacted BROKER M and inquired about purchasing the two aircraft that THIRDSTONE would lease to COMPANY A. BROKER M represented COMPANY B. COMPANY B was offering for sale two of the Boeing aircraft it owned for a total purchase price of approximately $21 million.

13. THIRDSTONE did not have its own money or assets to make the purchase. Further, THIRDSTONE never obtained any agreement to finance the purchase with any lender, investor, or financial institution.

14. Throughout December 2006 and thereafter, BROKER M informed COOPER and MESSNER that COMPANY B required adequate demonstration of THIRDSTONE's financing to purchase the two aircraft before COMPANY B would agree to sell the two aircraft to them. Neither BROKER M nor COMPANY B ever received any adequate demonstration of such financing from MESSNER and COOPER. No agreement was reached between THIRDSTONE and COMPANY B in December 2006, or at any time thereafter.

15. Nonetheless, on or about December 15 and December 16, 2006, and at other times, COOPER and MESSNER falsely stated to representatives of COMPANY A and BROKER S that THIRDSTONE had come to an agreement with COMPANY B to buy the two aircraft. In addition, COOPER falsely told COMPANY A and BROKER S that THIRDSTONE was "prepared to make an immediate deposit" to COMPANY B for the aircraft. In fact, THIRDSTONE had no assets and no financing to make such a deposit.

16. At the same time, COOPER directed COMPANY A to make a security deposit "to the account of our security agent, H[ &] Associates, a law firm in Washington DC." The proposal to use H & Associates as an escrow agent came after BROKER S and COMPANY A raised concerns about COOPER's initial proposal that the security deposit be paid to a bank account in COOPER's name.

17. On or about December 17, 2006, and thereafter, COOPER represented to COMPANY A that H & Associates would act as a separate escrow agent to secure COMPANY A's security deposit. For example, COOPER sent or caused to be sent to BROKER S and COMPANY A a forged letter, purportedly signed by LAWYER H, stating that the law firm would "act as agents" for the security deposit. LAWYER H did not know of the letter, and did not authorize LAWYER H's signature on the letter.

18. Neither COOPER nor MESSNER disclosed to COMPANY A that COOPER had signatory access to the H & Associates PNC Bank account ending in 0436 ("the H & Associates account") to which COOPER and MESSNER requested that COMPANY A pay the security deposit. Instead, in their December 2006 communications with representatives of COMPANY A and BROKER S, COOPER and MESSNER described H & Associates as a "law firm agent" for THIRDSTONE, or otherwise implied that H & Associates was a distinct entity from COOPER and MESSNER. Thereby, COOPER and MESSNER persuaded COMPANY A that H & Associates was an entity COMPANY A could trust to hold its security deposit.

19. On or about December 17, 2006, and after, COOPER and MESSNER represented to COMPANY A, in two documents called "Lease of Aircraft – Summary of Terms" between THIRDSTONE and COMPANY A (one for each aircraft), that its security deposit would be returned, less reasonable costs, if the aircraft were not provided.

c/9/12

20. On or about December 18, 2006, a representative of COMPANY A sent COOPER counter-signed copies of the two Summary of Terms agreements. A COMPANY A representative stated that COMPANY A would transfer its $1 million security deposit once COMPANY A received signed copies of agreements between THIRDSTONE and COMPANY B to purchase the aircraft.

21. That same day, responding to an inquiry from COOPER about executing an agreement with COMPANY B, BROKER M told COOPER and MESSNER that COMPANY B "will not take [THIRDSTONE's] offer seriously until" THIRDSTONE provided "proof of funding" to purchase the two aircraft. In this email and otherwise, BROKER M made clear to COOPER and MESSNER that COMPANY B had not reached an agreement with THIRDSTONE.

22. Nonetheless, that same day, COOPER falsely told representatives of COMPANY A that THIRDSTONE and COMPANY B had reached an agreement and that BROKER M had agreed to sign the agreements (one for each of the two aircraft). Later that day, COOPER emailed to a representative of COMPANY A two documents which purported to be signature pages of the THIRDSTONE-COMPANY B agreements (one for each aircraft) bearing the signatures of both COOPER and a purported representative of COMPANY B. The purported representative of COMPANY B did not exist. There were no agreements between THIRDSTONE and COMPANY B. The purported agreements between THIRDSTONE and COMPANY B were false and fraudulent.

23. On or about December 19, 2006, MESSNER told representatives of COMPANY A and BROKER S that COMPANY A's deposit would "be placed with our agent H[ & Associates]" and that THIRDSTONE's "agent" would "hold" COMPANY A's security deposit "as a good faith deposit until the completion of the deal or if we cannot come to terms it will be refunded upon your

request." At the same time, MESSNER attached what purported to be new signature pages of the two THIRDSTONE-COMPANY B agreements, this time bearing the signatures of both MESSNER and the same purported representative of COMPANY B who did not exist. In other words, the signature of the non-existent COMPANY B representative was a forgery.

24. On or about December 20, 2006, COMPANY A initiated an international transfer of $1 million to the H & Associates account.

### COOPER's and MESSNER's Transfer and Use of the Funds

25. On or about December 21, 2006, the wire transfer was completed and $1 million was deposited into the H & Associates account. That same day, COOPER wrote a check for $980,000, payable to himself, drawn on the H & Associates account, and deposited that check into a different PNC Bank account (ending in 3727) in COOPER's name. COOPER thereby transferred the $980,000 into an account in COOPER's name that was controlled exclusively by COOPER.

26. That same day, COOPER sent $175,000 of the COMPANY A security deposit proceeds to MESSNER's bank account via wire transfer from COOPER's PNC bank account (ending in 3727).

27. On or about January 10, 2007, COOPER made a second payment to MESSNER of $109,500 from the security deposit proceeds.

28. In total, COOPER transferred to MESSNER $284,500 in proceeds from COMPANY A's security deposit. MESSNER spent those funds for his personal use and benefit, including payments on his mortgage.

29. COOPER transferred and spent the balance of the security deposit proceeds for his use and benefit.

30. MESSNER and COOPER both knew that the money MESSNER received from COOPER was proceeds from COMPANY A's $1 million security deposit. MESSNER and COOPER both knew that by embezzling COMPANY A's security deposit proceeds in this manner, they were not merely breaching their contract with COMPANY A but also committing a crime by defrauding COMPANY A.

31. Despite communications with BROKER M demonstrating that there was no agreement between THIRDSTONE and COMPANY B, at no time did COOPER and MESSNER inform COMPANY A that the purported signed agreements between THIRDSTONE and COMPANY B were false and fraudulent.

32. At no time did COOPER and MESSNER inform COMPANY A that $980,000 of its $1 million security deposit had been diverted from the H & Associates account to COOPER's PNC account and spent by COOPER and MESSNER for their personal use and benefit.

33. At no time did COOPER and MESSNER inform COMPANY A that THIRDSTONE had no assets, other than the rapidly depleted COMPANY A security deposit, with which to secure funding to complete the purchase of the two Boeing aircraft. To the contrary, prior to inducing COMPANY A to make the $1 million security deposit, COOPER had stated that THIRDSTONE intended to use the $1 million security deposit as purchase money for the aircraft.

### MESSNER's Tax Evasion

34. For calendar years 2006 and 2007, MESSNER was a resident of Palatine, Illinois, and was married.

**Calendar Year 2006 Federal Income Tax Return**

8/29/13

35. For calendar year 2006, MESSNER received $175,000 in proceeds from the COMPANY A security deposit, paid to him by COOPER. MESSNER knew the $175,000 constituted taxable income to him.

36. On or about July 18, 2011, MESSNER caused to be filed with the Internal Revenue Service Center a false and fraudulent joint U.S. Individual Income Tax Return, Form 1040, on behalf of himself and his spouse. MESSNER never previously filed an income tax return for that year, whether individually or on behalf of him and his spouse.

37. In that false return for 2006, MESSNER caused to be stated that the joint taxable income of MESSNER and his spouse for calendar year 2006 was the sum of $0 and that the amount of tax due and owing thereon was the sum of $0. MESSNER did not include or report, in any way, the $175,000 in proceeds from the COMPANY A security deposit.

38. By filing false income tax returns which under-reported MESSNER's gross income and which failed to report the $175,000 in proceeds, MESSNER sought to, and did, evade his obligation to pay federal tax due and owing on that income.

39. In fact, MESSNER knew that his joint taxable income for the calendar year should have included at least the $175,000 in proceeds. Had MESSNER included the $175,000 in proceeds, MESSNER's joint taxable income (including, for example, deductions to income claimed by MESSNER) for calendar year 2006 would have been at least the sum of $122,467.73. Upon that joint taxable income, there was owing to the United States of America an income tax of at least $44,990.03.

**Calendar Year 2007 Federal Income Tax Return**

40. For calendar year 2007, MESSNER received $109,500 in proceeds from the COMPANY A security deposit, paid to him by COOPER. MESSNER knew the $109,500 constituted taxable income to him.

41. On or about April 10, 2011, MESSNER caused to be filed with the Internal Revenue Service Center a false and fraudulent joint U.S. Individual Income Tax Return, Form 1040, on behalf of himself and his spouse. MESSNER never previously filed an income tax return for that year, whether individually or on behalf of him and his spouse.

42. In that false return for 2007, MESSNER caused to be stated that the joint taxable income of MESSNER and his spouse for calendar year 2007 was the sum of $0 and that the amount of tax due and owing thereon was the sum of $0. MESSNER further caused to be stated that he was owed a refund of $2,496, which refund MESSNER received. MESSNER did not include or report, in any way, the $109,500 in proceeds from the COMPANY A security deposit.

43. By failing to include or report the $109,500 in proceeds, MESSNER sought to, and did, evade his obligation to pay federal tax due and owing on that income.

44. In fact, as MESSNER then and there knew, his joint taxable income for the calendar year should have included at least the $109,500 in proceeds. Had MESSNER included the $109,500 in proceeds, MESSNER's joint taxable income (including, for example, deductions to income claimed by MESSNER) for calendar year 2007 would have been at least the sum of $20,935.71. Upon that 2007 joint taxable income, there was owing to the United States of America an income tax of at least $14,745.57. Combined with the $2,496 fraudulent refund MESSNER sought and received, upon that 2007 joint taxable income, there was due and owing to the United State of America an income tax of at least $17,241.57.

45. MESSNER knew that the $175,000 and the $109,500 were each the proceeds of criminal activity, that is, MESSNER knew that the payments he received were embezzled from COMPANY A's security deposit and thus were the result of fraud against COMPANY A. MESSNER further knew that the proceeds constituted income to him.

46. Based on the behavior set forth herein, for tax years 2006 and 2007, MESSNER's tax evasion caused a total tax loss of $62,231.60.

The preceding statement of offense is a summary, made for the purpose of providing the Court with a factual basis for MESSNER's guilty plea to the charges. This statement of the offense is not intended to constitute a complete recitation of all facts known by defendant MESSNER, but is, instead, intended to provide the necessary factual basis for the guilty plea.

RONALD C. MACHEN JR.
United States Attorney
D.C. Bar No. 447889

By: *(signature)*
Jonathan P. Hooks
D.C. Bar No. 468570
Assistant United States Attorney
United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530

8/29/13

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

_____8/29/13_____          _____
Date                                           Alan Messner
                                               Defendant


## ATTORNEY'S ACKNOWLEDGEMENT

I have discussed this Statement of Offense with my client, Alan Messner, and I concur with his decision to stipulate to this Statement of the Offense.

_____8/29/13_____          _____
Date                                           Michelle Peterson
                                               Attorney for Alan Messner