UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | Crim. No. 13- 223 (ABJ) |
| ALAN MESSNER | : | |

### REPLY TO THE GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Mr. Messner, through undersigned counsel, hereby submits a brief response to the government's sentencing memoranda.[1] First and foremost, Mr. Messner fully accepts responsibility for the crime charged as well as the relevant conduct included in the statement of offense, i.e., the fraud committed against Merpati. He is truly remorseful for what happened to Merpati and the officers of that company. In no way does he mean to suggest he is not responsible along with Mr. Cooper for that harm. He has never asserted that this was a "mere accident or lapse." *Govt. Memo* at 1. He has not tried to minimize his conduct. His statement, through counsel, that he never intended to defraud anyone refers to his intentions at the *outset* of the deal. He fully intended to purchase aircraft for Merpati and worked very hard to make it happen. He concedes that he and Cooper made misrepresentations about Thirdstone in an effort to get Merpati's business[2], and concedes that this was fraud in the inception. The distinction we

---

[1] While the Court ordered simultaneous filing of sentencing memorandum, the government filed its memoranda several days after the defendant and, by doing so, had the opportunity to reply to the information submitted by Mr. Messner. Thus, as a matter of fairness, Mr. Messner files this reply to the government's sentencing memoranda.

[2] Suggestions by Mr. Cooper that the misrepresentations in the marketing materials and contracts were all the cause of Mr. Messner are untrue. Mr. Cooper knew exactly what he was doing – all of the marketing materials and contracts were approved by Mr. Cooper who represented himself to Mr. Messner as an honorable, successful, and qualified attorney. And, as

make is simply that when he began the venture, he fully intended to provide an aircraft. And this is supported by Mr. Messner's continued efforts to secure an aircraft from January through April. He truly believed, despite all evidence to the contrary, that he would be able to complete the transaction. He concedes that Thirdstone had no money or assets and that they never reached an agreement to finance the purchase. He only notes that he believed they would be able to do so. Mr. Cooper funded Thirdstone and Mr. Messner during Mr. Messner's attempts to obtain the aircraft for Merpati. As the government notes, on several occasions, Mr. Messner wrote checks on Thirdstone's account that were overdrafts. This was done when Mr. Cooper indicated he had transferred funds to that account for Mr. Messner's expenses.

When the funding fell through and Mr. Cooper embezzled the security deposit, the government is correct that Mr. Cooper blamed Mr. Messner and engaged in an elaborate scheme to make it look as if Mr. Messner was solely responsible.³ He used his position as Counsel for Thirdstone to ensure that a default judgement for the entire amount of the loss was entered

---

the government notes, Mr. "Cooper was more prominently involved in making such false representations." Govt. Memo at 4, ftn 3.

³    As the government notes in its Cooper Sentencing Memoranda, "On February 19, 2007, continuing their earlier demands that Thirdstone return the security deposit, Merpati executives met with Messner, who agreed to return it. Cooper sprang into action to create a false exculpatory version of events which would blame Messner. On February 20, Cooper emailed Hume two purported memos to file – intended to appear as messages to Messner, although there is no evidence either memo was emailed to Messner. Rather, the memos appear to be Cooper's attempt to create back-dated false exculpatory claims, shifting blame to Messner, but preventing Messner from responding to the false claims by not sending them to him." *Gov't Cooper Sentencing Memo* at 19 *citations omitted*. The government is correct – Mr. Messner did not receive these emails.

against Mr. Messner.[4]  Mr. Messner engaged in no such scheme.  Rather, he continued to seek to make the deal happen.  When he could not achieve this, he said the security deposit would be refunded.  Unfortunately, he was unable to make good on that intention.  Most telling is the description of the Broker from the International Aviation Group on March 22, 2007:

> Today, I spoke to both, Alan and Jon, separately.  First, Alan called, and wanted to convey that he wants to resolve every thing and wanted to convey that he will put together the package plus return the money and wanted to protect his reputation, was still talking about the bristol aircraft purchase, says that has difficultly dealing with Jon, who is not being forth coming, and said he was going to give him a surprise visit in Washington, he also said he did not take any money, and does not have any control over the money or the account.  Later, Jon returned my phone call, and said basically, that Alan is not coming forth, and that he has send all the money to Alan.  Jon also said that he kept $20,000 for his expenses.  I told him Jon this is 100 refundable money, you cant keep any money, he said that there is a clause to keep for reasonable expenses. (Typographical and grammatical errors in original).

Govt Memo at Ex. 1, p 31.  Mr. Messner admits that he should have acknowledged that Mr. Cooper had transferred some funds to him after receiving the security deposit, resulting in him receiving a portion of the embezzled funds.  However, his assertion that he had no control over the account was true. Mr. Cooper, not Mr. Messner, had full control over the bank account and it was Mr. Cooper who used the Hume law firm to embezzle the money.  Mr. Cooper, not Mr. Messner, had signatory access to the bank account.  Mr. Cooper, not Mr. Messner, forged a letter with his law partner's name stating that the firm would act as agents for the security deposit.  This is in no way to suggest that Mr. Messner does not fully accept responsibility for his actions.  He made numerous misrepresentations to Merpati, accepted money that had been embezzled, and

---

[4]   *See Govt Cooper Sentencing Memoranda* at 20-21 ("[A]fter Merpati retained civil counsel and threatened suit to recover the deposit Cooper used his position as counsel for Thirdstone to mislead them to believe that Messner was entirely to blame. . . . [C]ooper [falsely] told counsel for Merpati that the $500,000 for the 737-500 was transferred to Messner on Dec. 27, and that Hume & Associates requested a return of the security deposit from Messner."

failed to pay taxes on that money.  In an effort to explain his actions, he characterized the money not as an advance on salary which would be taxable, but as a loan.  He acknowledges that this was wrong.

Mr. Messner does not seek to shift blame to Mr. Cooper – he only seeks to have the Court understand the truth.  It is absurd to suggest, as Mr. Cooper apparently does, that Mr. Messner (a non-lawyer) provided legal advice to Mr. Cooper (a lawyer) that he could violate the trust and embezzle money.  As the government noted in its sentencing memoranda in the Cooper case, the evidence shows

> that Cooper made the majority of the fraudulent representations to Merpati to induce the deposit, that Cooper knew his representations were false, that Cooper controlled the security deposit funds, and that Cooper kept and spent the majority of those funds (over $700,000) for his own benefit.  Adding to the deviousness of Cooper's scheme, after stealing the proceeds, Cooper betrayed Messner and made a variety of false statements to shift the entirety of the blame to Messner.  Cooper even briefly succeeded in doing so, until Merpati obtained discovery (including Cooper's bank records) contradicting Cooper's false denials of criminal responsibility.

*Govt Cooper Sentencing Memo* at p. 9.

The government concedes, as it must, that Mr. Messner (unlike Mr. Cooper) indicated a desire to plead guilty well over a year ago, and that none of the resulting delay in entering a guilty plea is attributable to Mr. Messner.  This is further indicative of his full acceptance of responsibility and desire to set things right.

The government's request for a guideline sentence of 12 months exceeds that which is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing.  18 U.S.C. § 3553(a); *Pepper v. United States*, 131 S. Ct. 1229, 1242 (2011) ("sentencing judge's overarching duty under § 3553(a) [is to] impose a 'sentence sufficient, but not greater than necessary,' to

4

comply with the sentencing purposes set forth in § 3553(a)(2)"). While the government, as a matter of policy, always asks for a guideline sentence (absent substantial assistance or a negotiated 11(C) plea),[5] the Courts have made it abundantly clear that the guidelines are not presumed reasonable at the sentencing level and are entitled to no more weight than any other 3553 factor. *See e.g. Nelson v. United States*, 129 S.Ct. 890, 891 (2009) (guidelines are "not to be presumed reasonable"); *Peugh v. United States*, 2013 WL 2459523, 1 (U.S., June 10, 2013) ("The court may not presume that the Guidelines range is reasonable"); *United States v. Husein*, 478 F.3d 318 (6th Cir. 2007) ("The plain import of Booker is that a 1-day, below-the-Guidelines sentence, no less than a 7,300-day, above-the-Guidelines sentence, is now a viable sentence for a district court to impose so long as it is authorized by statute and reasonable within the meaning of 18 U.S.C. § 3553(a)"); *United States v. Harris*, 679 F.3d 1179, 1183 (9th Cir. 2012) ("sentencing is an art, not to be performed as a mechanical process but as a sensitive response to a particular person who has a particular personal history and has committed a particular crime"). In this case, a guideline sentence would be more than necessary. A sentence of probation with a period of home confinement and community service would be sufficient to satisfy the purposes of sentencing. See statement of President Bush commuting the 30-month sentence of Lewis "Scooter" Libby on July 2007 (found at http://www.whitehouse.gov/news/releases/2007/07/20070702-3.html) ("the [within guideline] prison sentence given to Mr. Libby is excessive. Therefore, I am commuting the portion of Mr.

---

[5] Perhaps the government should heed the advice of Chief Judge Merritt of the 8th Circuit who advised against "the problem of guidelineism, or 'guidelinitis' the inability of most federal courts to break their habit of mechanically relying just on the guidelines alone." *United States v. Sedore*, 512 F.3d 819 (6th Cir. 2008) (Merritt, C.J., dissenting).

Libby's sentence that required him to spend 30 months in prison.  My decision to commute his prison sentence leaves in place a harsh punishment for Mr. Libby.  The reputation he gained through his years of public service and professional work in the legal community is forever damaged.  His wife and young children have also suffered immensely.  He will remain on probation.  The significant fines imposed by the judge will remain in effect.  The consequences of his felony conviction on his former life as a lawyer, public servant and private citizen will be long-lasting.").

The sentence proposed by the defendant would not lead to sentencing disparity.  See e.g., *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009)(en banc) (when defendant convicted of tax evasion of $225,000 and guidelines range was 12-18 months, court's sentence to probation with one year home confinement not unreasonable). *See also 28 U.S.C. § 994j* (Congress stressed "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense").

Then sentence proposed by the defendant is sufficiently punitive in that the "stigma of a felony conviction is permanent and pervasive." *United States v. Smith*, 683 F.2d 1236, 1240 (9th Cir. 1982); see also United States v. Prosperi, 686 F.3d 32 (1st Cir. 2012) ("Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong they committed.") Additionally, short sentences in white collar cases have been shown to be sufficient to ensure general and specific deterrence. *United States v. Adelson*, 441 F. Supp.2d 506 (SDNY 2006) ("there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar'

offenders.")(citations omitted).

     Mr. Messner owes a great deal of restitution. It is appropriate for the Court to impose a period of home confinement rather than imprisonment to better enable him to make restitution. See 18 U.S.C. § 3553(a)(7) (cataloging "the need to provide restitution to any victim of the offense" as one factor to consider in formulating sentence.) *See also United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) (when defendant convicted of bankruptcy fraud and on probation for prior state conviction for fraud, guidelines range of 27 to 33 months, sentence of probation with seven months of home confinement appropriate in part to allow defendant to continue working to pay significant amount of restitution owed.); *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (in embezzlement case with $500,000 loss, probation appropriate in part to allow defendant better opportunity to provide restitution); *United States v. Bortnick*, 2006 WL 680544 (E.D. Pa., March 15, 2006) (unpub.) (in $8 million fraud case with guideline range of 51 to 63 months, seven day sentence imposed in part because it would enable defendant to work and pay restitution).

     A sentence of probation with community service and home confinement is a sufficient punishment for Mr. Messner. *See Gall v. United States*, 552 U.S. 38 (2007) (a sentence of probation is "a substantial restriction of freedom"; although "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms, offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. . . Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from

associating with any person convicted of a felony, and refrain from excessive drinking. . . Most probationers are also subject to individual 'special conditions' imposed by the court.") *See also United States v. Stall*, 581 F.3d 276 (6th Cir. 2009) (in child pornography case when guidelines were 57 to 65 months, court's sentence of one day in jail, 10 years of supervised release, and one year of home confinement, not unreasonable; "government disregards both the substantial restrictions placed on the liberty of those sentenced 'only' to supervised release); *United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008) (defendant embezzled $650,000 from non profit organization, resulting in guidelines range of 30 to 37 months, sentenced to one day in jail and supervised release for three years with special condition of one year in community treatment center to work; adequate because conditions of release are "quite oppressive [and defendants] are subject to standard conditions that substantially restrict their freedom."); *United States v. Coughlin*, 2008 WL 313099 (W.D.Ark. Feb 1, 2008) (unpub.) (when former CEO of Walmart embezzled and evaded taxes resulting in 33 to 41 month range, sentence of probation with home detention imposed; "home detention and probation can be severe punishments . . . hugely restrictive of liberty, highly effective in the determent of crime and amply retributive"); United States v. Prosperi, 686 F.3d 32 (1st Cir. 2013) (three years probation with six months home confinement and 1000 hours community service for mail fraud reasonable despite 87 month variance from guidelines).

The sentence proposed by Mr. Messner is particularly appropriate given the reliance of his family on him to be the primary caretaker. *See e.g., United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006) (probation rather than guideline sentence of 18 to 24 months appropriate for defendant convicted of fraud when sole caretaker for son); *United States v. Husein*, 478 F.3rd

318 (6th Cir. 2007) (downward departure for family circumstances warranted when defendant was irreplaceable to family, responsible to significant extent for physical and financial support of family). Finally, given Mr. Messner's compromised immune system, (see Attached Ex. 1), home confinement in lieu of incarceration is appropriate.

## CONCLUSION

For all of the foregoing reasons, Mr. Messner asks the Court to reject the Government's request for a period of confinement and instead impose a period of probation with a special condition of home confinement and community service.

.

                         Respectfully submitted,
                         A. J. KRAMER
                         FEDERAL PUBLIC DEFENDER

                                   /s/
                         _____
                         MICHELLE PETERSON
                         Assistant Federal Public Defender
                         625 Indiana Avenue, N.W.
                         Suite 550
                         Washington, D.C.  20004
                         (202) 208-7500 ext. 109